STATE OF LOUISIANA,
v.
LUKE ANTHONY LEADER.
No. 2008 KA 1500.
Court of Appeals of Louisiana, First Circuit.
February 13, 2009.
Not Designated for Publication
SCOTT M. PERRILLOUX, District Attorney, PATRICIA PARKER, Assistant District Attorney, Counsel for Plaintiff/Appellee State of Louisiana.
GLYNN J. DELATTE, JR., Counsel for Defendant/Appellant Luke Anthony Leader.
Before: PETTIGREW, McDONALD, and HUGHES, J J.
HUGHES, J.
Defendant, Luke Anthony Leader, was charged by bill of information with one count of first degree vehicular negligent injuring, a violation of LSA-R.S. 14:39.2. Defendant initially entered a plea of not guilty and filed a motion to suppress evidence against him. Following presentation of evidence on defendant's motion to suppress, the trial court denied the motion. Defendant sought supervisory writs of the trial court's denial. In State v. Leader, XXXX-XXXX (La. App. 1 Cir. 11/14/06) (not published), this court denied defendant's writ. The Louisiana Supreme Court also denied a writ application filed by defendant in State v. Leader, 2006-2945 (La. 2/16/07), 949 So.2d 412. Defendant then entered a no contest plea to the charged offense under State v. Crosby, 338 So.2d 584 (La. 1976), and reserved his right to appeal the trial court's denial of his motion to suppress evidence. The trial court subsequently sentenced the defendant to a term of three years at hard labor, suspended, and three years active probation with special conditions.
Defendant appeals, citing the following as error:
1. The trial court erred when denying the motion to suppress because the burden of proof is on the State to establish that it has complied with the specific requirements that the legislature has set forth when blood is drawn for the purpose of determining the alcoholic content under LSA-R.S. 32:662, et seq. and they failed to do so.
2. The trial court erred in denying the motion to suppress because the officers forcibly drew blood from the defendant without his consent, when there was no evidence presented that serious bodily injury or a fatality had occurred, as required by statute.
3. The trial court erred in denying the motion to suppress since the State failed to show that the officer strictly complied with the requirements for administering the chemical test for intoxication as outlined by the Louisiana Legislature under Title 55 of the Louisiana Administrative Code and LSA-R.S. 32:661-669 of the Louisiana Implied Consent Law. More specifically, the officer failed to strictly comply with LSA-R.S. 32:661(C)(1) of the Louisiana Implied Consent Law.[1]

FACTS
On January 14, 2004 at approximately 11:00 p.m., Tiffany Landrum was driving eastbound in the right lane on Interstate 12 through Livingston Parish on her way to Florida. Ms. Landrum, who had set her cruise control on seventy-five miles per hour, glanced in her rearview mirror and saw headlights quickly approaching. However, instead of the approaching vehicle passing Ms. Landrum, it struck the rear of her vehicle, causing it to leave the roadway, travel down an embankment, and collide with several trees.
Daryl Arceneaux of the Denham Springs Police Department was dispatched to the accident, which he described as "very serious." When Officer Arceneaux arrived at the scene, he observed Ms. Landrum's red vehicle off the roadway and stated that it was "completely demolished." Officer Arceneaux observed Ms. Landrum in her vehicle and noted that she was trapped in the vehicle and "covered in blood." Because it appeared to be a critical accident involving loss of life or serious injury, Officer Arceneaux contacted the Traffic Homicide and Crime Scene Unit.
Approximately seven tenths of a mile east of Ms. Landrum's vehicle, a second vehicle was discovered alongside the roadway. The vehicle was a silver two-door BMW, which was smoking and damaged in the front. Officer Ryan Smith of the Walker Police Department was also involved in investigating this accident and had noticed the defendant's vehicle as he drove westbound on Interstate 12. After turning around and stopping near the BMW, Officer Smith noticed the vehicle's air bags had been deployed, but no one was in the vehicle. A short time later, the defendant walked out of the woods alongside the roadway. When Officer Smith questioned defendant what he was doing in the woods, defendant replied that he was "scared." Defendant admitted the BMW was his vehicle, but claimed someone else was driving and he thought that unnamed person may have struck a red vehicle.
Officer Smith handcuffed the defendant, read him the Miranda rights,[2] and placed him in the back of a patrol unit. After being placed in handcuffs, the defendant became combative and kept insisting he was not driving the vehicle. When asked by Officer Smith if he had consumed any alcohol, the defendant admitted that he had been drinking quite a lot. Officer Smith testified that the defendant seemed pretty unsure of his balance, was not speaking clearly, and appeared as if he had been running around the wooded area. Officer Smith could detect a strong odor of alcohol, but was not sure if it was on the defendant's clothing, since they appeared to be wet. Despite an extensive search of the area, no other person was located.
Officer John Albritton of the Denham Springs Police Department testified that he arrived at the accident scene where Ms. Landrum's vehicle was positioned. Officer Albritton described Ms. Landrum as "very panicked" and covered in blood. Officer Albritton admitted that he was concerned whether Ms. Landrum would live or die. Officer Albritton then proceeded to where the defendant had been detained by Officer Smith.
When Officer Albritton arrived and met the defendant, he noticed the defendant had a strong odor of alcohol on his breath and that the defendant was unable to explain what happened between the two vehicles. Officer Albritton advised the defendant of his Miranda rights, took custody of the defendant and transported him to the Denham Springs Police Department. Once at the police department, Officer Albritton administered field sobriety tests to the defendant, in which he performed poorly. Office Albritton then advised the defendant of his rights relative to the chemical tests for intoxication. Defendant signed the forms, but refused to submit to the intoxilyzer test. Officer Albritton testified that he informed the defendant that the law provided that he could take his blood in this situation because it involved a case of serious bodily injury or fatality. Defendant responded that the police were "overreacting."
Officer Albritton transported the defendant to Summit Hospital in order to obtain a blood sample. Upon their arrival at the hospital, Officer Albritton again advised the defendant of his rights relative to the chemical tests for intoxication including the blood withdrawal form. Defendant refused to sign the rights form or allow his blood to be withdrawn.
Jill Woodcock, a registered nurse, was the charge nurse in the emergency room of Summit Hospital. Because of the defendant's initial refusal to allow his blood to be withdrawn, she advised Officer Albritton that he would need to get reinforcements if the withdrawal would be done against the defendant's wishes. Officer Albritton contacted Officer Arceneaux, who arrived at the hospital shortly thereafter. Officer Arceneaux testified that he explained to the defendant that due to the seriousness of the accident, the defendant did not have the right to refuse to provide a blood sample. During his conversation with Officer Arceneaux, the defendant admitted he had been drinking at a restaurant in Baton Rouge and had gotten drunk and did not remember anything after that.
Although the defendant still objected, he did not resist when Nurse Woodcock took the sample. Nurse Woodcock testified that she was familiar with drawing blood for law enforcement purposes and used the kit provided by the officer to draw two containers of blood from the defendant. Nurse Woodcock further testified that she withdrew the blood using the contents of the blood kit, signed the paperwork and tubes provided in the kit, then turned everything over to the police.
The blood kit was turned over to Officer Lynn Connor, the evidence officer of the Denham Springs Police Department. Officer Connor sealed the tubes with blue tape, initialed the tape, and transported the kit from the hospital to the State Police Crime Lab. Officer Connor testified that these types of Biological Specimen Kits obtained from the State Police contain two vials, a urine bottle, a needle with a cap on it, and seals.

MOTION TO SUPPRESS EVIDENCE
The record in this case reflects that the defendant filed a motion to suppress the blood test results. Following a hearing, the trial court denied the motion. The defendant filed a supervisory writ application with this court seeking review of the trial court's ruling on the motion to suppress. Defendant's writ application presented the same two arguments as he currently sets forth in his first two assignments of error in this appeal. This court reviewed the defendant's claim and denied the writ application in an unpublished decision. State v. Leader, XXXX-XXXX (La. App. 1 Cir. 11/14/06). The defendant then filed a supervisory writ application with the Supreme Court, which also was denied. State v. Leader, 2006-2945 (La. 2/16/07), 949 So.2d412.
By his first two assignments of error, the defendant again seeks review of the trial court's ruling denying the motion to suppress. Although the pretrial determination does not absolutely preclude a different decision on appeal, judicial efficiency demands that this court accord great deference to pretrial decisions unless it is apparent, in light of a subsequent trial record, that the determination was patently erroneous and produced an unjust result. See State v. Humphrey, 412 So.2d 507, 523 (La. 1981) (on rehearing).
Upon review, we find the record in this case fully supports our previous decision on the issues presented in the writ application and is devoid of any additional circumstances and/or evidence that would lead us to change the conclusion we reached therein.

Compliance with Statutory Requirements for Drawing Blood
In his first assignment of error, the defendant argues the State failed to carry its burden of proof that it complied with the statutory requirements for drawing blood under LSA-R.S. 32:662, et seq. Specifically, the defendant argues the State failed to establish that the blood drawn from him was in accord with the methods approved by the Department of Public Safety.
Defendant points to the testimony of Nurse Woodcock, wherein she describes using a syringe to draw defendant's blood, and the testimony of Officer Connor, who testified that the blood kit failed to contain a syringe and argues that Nurse Woodcock used an instrument not contained in the blood kit, which violated the Department of Public Safety regulations. Defendant relies on State v. Busby, XXXX-XXXX (La. App. 3 Cir. 2/2/05), 893 So.2d 161, to support his contention that the failure to follow protocol renders the results of a blood alcohol test inadmissible.
We disagree. First, we note Louisiana Administrative Code, Title 55, Part I, § 555, promulgated in accordance with LSA-R.S. 32:663, sets forth the rules and procedure for collection of blood for analysis for alcohol content. Specifically, Section §555(G) provides:
Blood drawn for the purposes of determining the alcoholic content therein shall have been taken with the contents of sealed "B-D Blood Alcohol Kit" Numbers 4000, 4990 or 4991 (manufactured by Becton-Dickinson division of Becton-Dickinson and Company), or "NIK Blood Alcohol Kit" Numbers 4000, 4990, 4991 (manufactured by NIK Public Safety, Inc.) or similar blood collection kits as approved. Such kits will be made available to all law enforcement agencies by the Louisiana State Police.
1. All kits approved by this department shall contain the necessary preservative to insure stability of the sample as provided by the manufacturer and contain no ethyl alcohol. Each approved kit must be manufactured specifically for blood alcohol determinations in living or postmortem subjects.
Our review of the record indicates that Nurse Woodcock was a registered nurse in the State of Louisiana, who was familiar with drawing blood for law enforcement purposes. Nurse Woodcock testified that while Officers Albritton and Arceneaux were present, she used a syringe to draw the defendant's blood and place it in the tubes provided by the kit. The tubes were sealed and signed by Nurse Woodcock and placed back into the box from which they originated.
Officer Connor testified that she was summoned to the hospital to take possession of the blood kit. When she arrived at the hospital, the tubes of blood were already in the blood kit. Officer Connor sealed the vials with the blue tape, and initialed the blue tape. Officer Connor then delivered the blood kit to the Louisiana State Police Crime Lab.
During her testimony at the hearing on the motion to suppress, Officer Connor was asked to open the sealed blood kit. When she did, the kit contained two vials of blood, a urine bottle (which was not collected in this case), and a needle with the cap on it, plus the seals. The kit did not contain a syringe.
However, whether the kit contained a syringe is not dispositive of the admissibility of the blood alcohol test. In State v. Green, 418 So.2d 609, 613 (La. 1982), the supreme court noted that one of the important factors in direct analysis of specimens of blood is protecting the blood from contamination from time of taking, during transportation to the chemist, and at the time of analysis. The court commented that the Department of Public Safety's rule prescribing the types of blood collection kits to be used merely describes the types of blood collection devices that the department considers reliable for that purpose. The court further noted that LSA-R.S. 32:663 does not prohibit the introduction of test results merely because a different type of collection kit or anticoagulant (as was the scenario in Green) was used than that approved by the department. The Green court failed to require exclusion of such test results if it could be proved by competent, admissible evidence that the collection device or anti-coagulant employed provided equivalent protection of the specimen. State v. Green, 418 So.2d at 612-13.
Thus, in the present case, the failure of Nurse Woodcock to use a syringe, that arguably may never have been contained in the blood collection kit, does not render the blood alcohol test results inadmissible. Nurse Woodcock clearly utilized the equipment in the blood collection kit to ensure defendant's blood specimens were protected. Moreover, defendant's reliance on State v. Busby is misplaced. In Busby, the State failed to prove compliance with the protocol for drawing a defendant's blood because there was no evidence presented to identify who drew the blood and whether that person was qualified to do so under the law. State v. Busby, XXXX-XXXX at p. 10, 893 So.2d at 166. In fact, the identity of that person could not be ascertained as required by the hospital's protocol. In contrast, in this present case, the State clearly proved that it protected defendant's blood sample during withdrawal, transportation, and storage.
This assignment of error is without merit.

Withdrawal of Blood Without Defendant's Consent
In the defendant's second assignment of error, he contends that the trial court erred in denying his motion to suppress because the officers forcibly drew blood from him without his consent when there was no evidence presented that serious bodily injury or a fatality had occurred, as required by statute.
Louisiana Revised Statute 32:666 provided in pertinent part at the time of this offense:
A. (1)(a)(i) When a law enforcement officer has probable cause to believe that a person has violated R.S. 14:98, R.S. 14:98.1, or any other law or ordinance that prohibits operating a vehicle while intoxicated, that person may not refuse to submit to a chemical test if he has refused to submit to such test on two previous and separate occasions of any previous such violation or in any case wherein a fatality has occurred or a person has sustained serious bodily injury in a crash involving a motor vehicle, aircraft, watercraft, vessel, or other means of conveyance. Serious bodily injury means bodily injury which involves unconsciousness, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death. The law enforcement officer shall direct that a chemical test be conducted of a person's blood, urine, or other bodily substance, or perform a chemical test of such person's breath, for the purpose of determining the alcoholic content of his blood and the presence of any abused substance or controlled substance as set forth in R.S. 40:964 in his blood in such circumstances. A physician, registered nurse, qualified technician, or chemist shall perform a chemical test in accordance with the provisions of R.S. 32:664 when directed to do so by a law enforcement officer.
Officer Arceneaux testified that Ms. Landrum's vehicle was completely demolished and she was trapped in the vehicle and covered in blood. Officer Arceneaux was the officer who contacted the Traffic Homicide Unit because the severity of the accident led him to believe Ms. Landrum sustained serious injuries and her life was in jeopardy.
Officer Albritton testified that he arrived at Ms. Landrum's vehicle before any medical personnel. According to Officer Albritton, Ms. Landrum was "panicked" and "covered with blood." Due to the condition of the vehicle, Officer Albritton could only see the top portion of Ms. Landrum's body, and he was very concerned whether Ms. Landrum would survive. Officer Albritton testified that Ms. Landrum had to be extricated from the wreckage of her vehicle.
It is evident at the time the officers compelled the defendant to provide a blood sample, they were under the good-faith belief that Ms. Landrum had sustained serious, perhaps life-threatening, injuries. The State also introduced photographs of Ms. Landrum's vehicle taken at the scene to demonstrate the level of damage inflicted from the accident. These photographs clearly corroborate the testimony that Ms. Landrum's vehicle had been demolished. Based on the evidence presented at the motion to suppress, we cannot say the trial court erred in finding the defendant had no right to refuse to provide blood samples under these circumstances.
This assignment of error is without merit.

Compliance with LSA-R.S. 32:661(0(1)
In his third assignment of error, the defendant asserts the police officers failed to strictly comply with LSA-R.S. 32:661(C)(1), which provided at the time of this offense:
C. (1) When a law enforcement officer requests that a person submit to a chemical test as provided for above, he shall first read to the person a standardized form approved by the Department of Public Safety and Corrections. The department is authorized to use such language in the form as it, in its sole discretion, deems proper, provided that the form does inform the person of the following:
(a) His constitutional rights under Miranda v. Arizona.
(b) That his driving privileges can be suspended for refusing to submit to the chemical test.
(c) That his driving privileges can be suspended if he submits to the chemical test and such test results show a blood alcohol level of 0.08 percent or above or, if he is under the age of twenty-one years, a blood alcohol level of 0.02 percent or above.
(d) That his driving privileges can be suspended if he submits to the chemical test and the test results show a positive reading indicating the presence of any controlled dangerous substance listed in R.S. 40:964.
(e) The name and employing agency of all law enforcement officers involved in the stop, detention, investigation, or arrest of the person.
Defendant alleges the State failed to follow the statutory mandates because the form read to defendant prior to testing failed to include subsections (d) and (e) of the statute. However, this case presents a situation controlled by LSA-R.S. 32:666(A)(l)(a)(i), wherein defendant did not have a right to refuse the chemical test, i.e., provide a blood sample, because there was a clear basis to believe Ms. Landrum had sustained serious bodily injury. Accordingly, we find any alleged deficiency in the Implied Consent Form is not an issue in this matter.
This assignment of error is without merit.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] The argument contained in this assignment of error was not presented as an issue for review in the defendant's prior writ application to this court.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).